**Jack Ray ALLEN and Sandy Lynn Allen, husband and wife, Plaintiffs-Appellants,**

v.

**A.H. ROBINS COMPANY, INC., a Virginia corporation, Defendant-Appellee.**

No. 83–3767.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1984.

Decided Jan. 29, 1985.

Terry Lee Johnson, Twin Falls, Idaho, for plaintiffs-appellants.

Richard E. Hall, Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, for defendant-appellee.

Before SCHROEDER, FARRIS, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

The district court granted summary judgment for defendant, A.H. Robins Company, Inc., the manufacturer of the Dalkon Shield intrauterine device, in a products liability action involving allegations of negligence, fraud, breach of contract, and breach of warranty. Because we disagree with the district court's conclusion that the Idaho statute of limitations bars this diversity action, we reverse and remand to the district court.

## FACTS

On October 17, 1972, Sandy Allen had a Dalkon Shield, an intrauterine device

("IUD") manufactured by the appellee A.H. Robins Company, inserted by Dr. Steven C. Green. At the time of insertion, the doctor gave her a pamphlet prepared by Robins. This pamphlet contained instructions on how to check the IUD and listed such possible side effects of the device as cramping.

After eighteen months of using the Dalkon Shield, Allen began to experience increased cramping, discharge, spotting, tenderness of the uterus, and pressure on the bladder. She visited Dr. Green because of these complaints in March 1974. When the severity of her symptoms increased, Allen saw Dr. Green again, in July 1975. At that time, Dr. Green prescribed antibiotics for the urinary tract and external vaginal infections that he diagnosed. Allen raised the possibility of changing IUDs because she had read in the manufacturer's pamphlet that the device should be changed within a three-year period. However, the doctor told her a change was not necessary. In December 1975, Dr. Green prescribed an ointment for a yeast infection Allen had and again reassured her about her IUD. She continued to take the prescribed antibiotics for what she had been told was a urinary tract infection.

Allen's health problems continued and she saw Dr. Randall J. Slickers on May 25, 1977; she complained of headaches, nausea, bleeding, and pain in the pelvic area. Dr. Slickers found pelvic tenderness and accompanying infection. As part of the treatment of the infection, Dr. Slickers removed the Dalkon Shield. In her deposition, Allen testified that Dr. Slickers did not tell her that the Dalkon Shield itself was the cause of her infection but said only that it should be removed because of the infection. Dr. Slickers said in his deposition that he could not recall whether he had told Allen that her problems might be caused by the IUD but added that it was "more than likely." According to Allen, Dr. Slickers mentioned to her that the Dalkon Shield had been removed from the market by the A.H. Robins Company, but when she inquired as to why this had been done, Dr. Slickers changed the subject.

During this time, according to Allen, she did not realize that the Dalkon Shield might have caused her symptoms. Because she did not attribute her problems to the IUD, in February of 1978 she had another intrauterine device, a CU–7, which was manufactured by G.D. Searle and Company, inserted. She experienced the same symptoms that she had experienced with the Dalkon Shield. The CU–7 was removed by Dr. Slickers more than two years later, on November 20, 1980. After its removal her health problems persisted and in July 1981 she underwent a hysterectomy.

Appellants allege that A.H. Robins Company falsely represented facts about the Dalkon Shield both to the medical profession and the public and knowingly concealed various material facts about the safety of the product. The appellants further allege that Robins intended that the appellants rely on its conduct and that they did so. Finally, the appellants claim that they were in no position to discover the truth about the Dalkon Shield.

In support of their claims that Robins was aware of the dangers associated with use of the Dalkon Shield, the Allens submitted several documents, including both internal memoranda of the A.H. Robins Company and letters and publications intended for physicians and wholesale distributors of the product. Among the evidence submitted was a letter dated June 23, 1972, written by Dr. Thad J. Earl who was then Robins' leading consultant on the Dalkon Shield. Dr. Earl expressed his concern, based on studies he had reviewed, that leaving a Dalkon Shield in place after pregnancy could result in septic abortion. This information was not released to either the medical profession or to users of the Dalkon Shield until 1974. The Allens also submitted to the district court a memorandum dated June 11, 1970, written by Dr. Fred A. Clark, who was at that time Robins' medical director. This memorandum includes information indicating that the A.H. Robins Company initially misrepresented the pregnancy rate of the Dalkon Shield as 1.1%,

when it was aware that it was actually closer to 2.3%. Most important, the Allens submitted evidence that Robins had significant information in its possession regarding the "wick effect" created by the Dalkon Shield—an effect that permits bacteria to enter sterile places, and that may lead to pelvic inflammatory disease and sterility.

The A.H. Robins Company finally removed the Dalkon Shield from the market in June 1974. However, in its June 28 press release Robins stressed that there was "no reason to believe at this time that physicians should remove the Dalkon Shields from patients now wearing [them]." One year later, on August 8, 1975, in another press release, Robins again reassured those using its device that it was safe to continue doing so. The release said, "A.H. Robins remains firm in its belief that the Dalkon Shield, when properly used, is a *safe* and effective IUD." (Emphasis added). Not until more than five years later on September 25, 1980, did Robins advise doctors to remove the Dalkon Shields from their patients. Its "Dear Doctor" letters, sent on that date to over 200,000 doctors, appear to constitute the first public acknowledgment by Robins of the causal relationship between the Dalkon Shield and the physical injuries incurred by its users.

Sandy Allen testified that she was unaware of any causal relationship between the Dalkon Shield and her infections until she watched the April 12, 1981 episode of *60 Minutes*, which discussed the Dalkon Shield and noted that it had been removed from the market because it caused pelvic inflammatory disease. The program described symptoms experienced by users of the Dalkon Shield; they were remarkably similar to those that she had suffered.

On September 4, 1981, five months after she viewed the television program and less than one year after Robins' "Dear Doctor" letters, Allen and her husband filed suit in state court against A.H. Robins Company as manufacturer of the Dalkon Shield and

G.D. Searle and Company as manufacturer of the CU–7.[1] The case was removed on diversity grounds from state to federal court by Searle. Robins then moved for summary judgment based upon the Idaho statute of limitations. The district court granted the motion and the plaintiffs appealed the district court's order of summary judgment.

## STANDARD OF REVIEW

In reviewing a district court's order granting summary judgment we must view the evidence and inferences therefrom in the light most favorable to the party against whom the district court ruled. *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1328–29 (9th Cir.1983); *see* Fed.R.Civ.P. 56(c). We review the district court's decision *de novo* and determine whether, on the basis of the pleadings, affidavits, depositions, and other evidence available at the time the motion was made, there is any genuine issue of material fact in dispute and whether the moving party is entitled to judgment as a matter of law. *M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483, 1487 (9th Cir.1983); *Turner v. Prod*, 707 F.2d 1109, 1114 (9th Cir.1983), *cert. granted sub nom. Heckler v. Turner*, —— U.S. ——, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984). Moreover, in *In re McLinn*, 744 F.2d 677, 680 (9th Cir.1984) (en banc), we recently held that a district court's construction of state law in a diversity case, or any other case involving state law, will be reviewed *de novo*. Here the district court applied Idaho law.

## THE DISCOVERY EXCEPTION

Section 6–1303 of the Idaho Code requires that an action against a product seller be brought within two years "from the time the cause of action accrued as defined in [Idaho Code] section 5–219." Idaho Code § 6–1303(3) (Supp.1984). Section 5–219 provides that in the general case

---

1. In their suit, the Allens asserted that Robins and G.D. Searle & Company are jointly and severally liable for the injuries to Sandy Allen.

There is no issue before us as to whether the statute of limitations has run as to the claim against Searle.

"the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of." Idaho Code § 5–219(4) (1979). In the present case, the Dalkon Shield was inserted in Sandy Allen in October 1972 and then, after a long series of infections and side effects, it was removed in May 1977, more than four years prior to the filing of this action. The district court agreed with Robins that the Allens' claims filed in September 1981 were barred by the Idaho statute of limitations.

According to the district court, the statute of limitations, Idaho Code §§ 5–219, 6–1303 (1979 & Supp.1984), ran at the latest on May 25, 1979, two years from the time when Sandy Allen had her Dalkon Shield removed. The Allens claim, however, that their cause of action falls within the "discovery exception" set forth in Idaho Code § 5–219(4). That section extends the statute of limitations in certain cases to one year from the time when the injured party knew or should have been put on inquiry regarding the injury. The appellants claim that each of the two exceptions contained within the "discovery exception" serves to extend the limitations period in the instant case. The "discovery exception" includes (1) the foreign object exception, and (2) the fraudulent concealment exception. The Idaho statute provides:

> [W]hen the action is for damages arising out of the *placement and inadvertent, accidental or unintentional leaving of any foreign object in the body* of any person by reason of the professional malpractice of any hospital, physician or other person or institution practicing any of the healing arts *or* when *the fact of damage has,* for the purpose of escaping responsibility therefor, *been fraudulently and knowingly concealed from the injured party* by an alleged wrongdoer standing at the time of the wrongful act, neglect or breach in a professional or commercial relationship with the injured party, *the same shall be deemed to accrue when the injured party knows or in the exercise of reasonable care should have been put on inquiry re-*

*garding the condition or matter complained of.*

Idaho Code § 5–219(4) (1979) (emphasis added).

A. *The Foreign Object Exception*

■ The foreign object exception has been strictly interpreted by the Idaho Supreme Court. For example, in *Cook v. Soltman,* 96 Idaho 187, 525 P.2d 969 (1974), the court held that the foreign object exception did not apply in an action where the plaintiff alleged that a doctor negligently failed to remove all particles of a tree limb and shirt from his back. The court held the exception inapplicable because the plaintiff was aware that the particles had penetrated his back, and because the defendant did not place or mistakenly leave them there. *Id.* at 190, 525 P.2d at 972.

In *Johnson v. Gorton,* 94 Idaho 595, 495 P.2d 1 (1972), the Idaho Supreme Court held that the foreign object exception did not apply in an action alleging negligent failure by a surgeon to remove a bullet during emergency treatment of a gunshot wound in 1959. The plaintiff contended that the defendant surgeon failed to disclose the continued presence of the bullet and led the plaintiff to believe that it had been extracted. The Idaho Supreme Court said that because the physician did not himself negligently place or leave the foreign object, but "rather he simply did not remove it in the course of treatment," the exception did not apply. *Id.* at 596, 495 P.2d at 2.

Similarly, the foreign object exception to the Idaho statute of limitations does not apply here because there was not an "inadvertent, accidental or unintentional leaving" of the Dalkon Shield in Sandy Allen's body. Rather, the Dalkon Shield was intentionally placed in Sandy Allen's body by her physician with her full consent for the purpose of birth control. We therefore hold that the district court was correct in ruling that the foreign object exception to the Idaho statute of limitations is not applicable.

## B. *The Fraudulent Concealment Exception*

The fraudulent concealment exception to the Idaho accrual rule applies when the "fact of damage has ... been fraudulently and knowingly concealed from the injured party." Idaho Code § 5–219(4) (1979). In such a case, the action accrues when the injured party "knows ... or should have been put on inquiry regarding the condition or matter." *Id.* The district court held that the exception did not apply to the Allens' claims because Sandy Allen was aware "or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of," *id.*, no later than May 1977 when Dr. Slickers removed her Dalkon Shield as part of the treatment of her pelvic infection. We disagree.

■ Under the Idaho statute, the fraudulent concealment exception is limited to situations where the "fact of damage" has been fraudulently concealed from the plaintiff. There are no reported Idaho cases that interpret the term "fact of damage" as used in the statute.[2] But the Idaho Supreme Court has interpreted the portion of the statute that provides that, when there has been either an intentional leaving of a foreign object or a fraudulent concealment, the cause of action accrues when the injured party is on notice of "the condition or matter complained of." *Reis v. Cox*, 104 Idaho 434, 660 P.2d 46 (1982). In *Reis* the claimed negligence was the failure of a doctor to remove a Penrose surgical drain from the plaintiff's abdomen following surgery. The defendant argued that the phrase "matter or condition complained of" was the recurring pain and abcesses in the plaintiff's abdominal area, for which she had repeatedly and unsuccessfully sought medical treatment beginning almost four years before filing suit. The Idaho Supreme Court disagreed and held that the phrase "condition or matter complained of" means "the condition which ultimately is alleged to constitute the malpractice or negligence." 660 P.2d at 50. The cause of action did not accrue until the plaintiff knew that the drain had been left inside her.

■ Thus, under Idaho law, if either the foreign object or the fraudulent concealment exception applies, the cause of action for medical malpractice accrues not when the plaintiff has nonspecific symptoms but when the plaintiff should reasonably have been on notice of the specific type of injury that was caused by the defendant's tortious act. *Cf. Raddatz v. United States*, 750 F.2d 791, 796 (9th Cir.1984) (FTCA claim based on pelvic infection caused by combination of improper IUD insertion and later failure to treat resultant infection accrued on date that patient was told that she had a serious

---

2. The Allens rely on several cases applying the law of other states where courts have held that a fraudulent concealment exception to a statute of limitations applies when the plaintiff knows that he or she has been injured but alleges that the defendant has fraudulently concealed the *cause* of injury. *See, e.g., Dawson v. Eli Lilly & Co.*, 543 F.Supp. 1330, 1334 (D.D.C.1982); *Nelson v. A.H. Robins Co.*, 515 F.Supp. 623, 626 (N.D.Cal.1981); *cf. United States v. Kubrick*, 444 U.S. 111, 113, 100 S.Ct. 352, 355, 62 L.Ed.2d 259 (1979) (statute of limitations for medical malpractice under Federal Tort Claims Act does not begin to run until the plaintiff has discovered both his injury and its cause); *Harrison v. United States*, 708 F.2d 1023, 1028 (5th Cir.1983) (same).

In the Dalkon Shield cases in particular, courts in various jurisdictions have liberally construed the discovery exception so as to afford relief to plaintiffs who did not know and had no reason to know that the Shield had caused their injuries. *See, e.g., Mann v. A.H. Robins Co.*, 741 F.2d 79 (5th Cir.1984); *Hansen v. A.H. Robins Co.*, 715 F.2d 1265 (7th Cir.1983); *Ballew v. A.H. Robins Co.*, 688 F.2d 1325 (11th Cir.1982); *Dawson v. Eli Lilly & Co.*, 543 F.Supp. 1330 (D.D.C.1982); *Nelson v. A.H. Robins Co.*, 515 F.Supp. 623 (N.D.Cal.1981); *see also Knaysi v. A.H. Robins Co.*, 679 F.2d 1366 (11th Cir.1982), discussed *infra* pp. 1371–1372 (reaching same result by applying doctrine of equitable estoppel). As we discuss in the next part of the opinion, the reasoning in these cases persuades us that equitable estoppel should bar Robins' use of the statute of limitations as a defense in this case. The cases do not, however, help us construe the Idaho statute, which limits the fraudulent concealment exception to cases where the "fact of damage," rather than the cause of injury, has been fraudulently concealed.

condition, not on date patient was told that IUD was improperly inserted). Assuming Sandy Allen's allegations are correct in this case, she was not aware that her infections might be related to a serious medical condition that could result in sterility or a hysterectomy until she watched the April 12, 1981 episode of *60 Minutes* and heard the description of the symptoms suffered by Dalkon Shield users, and the types of permanent injury that could be caused by the Shield. If there was fraudulent concealment, her cause of action accrued less than one year before she filed suit.

■ Robins nevertheless contends that the fraudulent concealment exception does not apply because it did not conceal the "fact of damage" from Allen within the meaning of the Idaho statute. Robins contends that when Allen suffered the symptoms of a pelvic infection she was on notice of the "fact of damage." According to Robins, even though it may have concealed the fact that its product was causing permanent damage, it did not conceal the "fact of damage." We disagree.

Assuming Allen's allegations are true, Robins did more than conceal causation. It concealed the damage itself. Allen had no notice before April, 1981 that she might have suffered severe damage which could lead to sterility or a hysterectomy. Before that time she was being treated for a series of nonspecific infections. Urinary tract and pelvic infections are common and frequently occur without any obvious cause other than the presence of a microorganism. Like common cold sufferers, individuals who have other sorts of infections generally consider them transitory annoyances that do not require or merit more than symptomatic treatment. Absent other information, individuals suffering from infections are not likely to view their symptoms as an indication that more lasting damage has taken place. Allen had no reason to suspect that her infections were an indication of serious, permanent, underlying damage. *See Raddatz*, 750 F.2d at 796 (patient may reasonably rely on doctor's assurances that symptoms are a normal consequence of condition that does not require treatment). She was therefore not only unaware of the cause of her injury, but also of the "fact of damage" itself.

■ Allen alleges that Robins fraudulently concealed from doctors and patients the serious and potentially permanent effects of the Dalkon Shield. This constitutes a sufficient allegation that Robins fraudulently concealed the "fact of damage" for which Allen now seeks redress. However, even if we were to agree with Robins with respect to the meaning of the "fact of damage," summary judgment would be inappropriate for the reasons discussed in the next part of the opinion.

## THE DOCTRINE OF EQUITABLE ESTOPPEL

■ The Allens urge that the doctrine of equitable estoppel prevents Robins from interposing the bar of the statute of limitations in this case.[3] The doctrine of estoppel has long been accepted as one of the bulwarks of equity in Anglo-American jurisprudence. Estoppel to plead the statute of limitations is often invoked on the broad general ground that parties may not take advantage of their own wrongs. As a general rule, a defendant will be estopped from setting up a statute-of-limitations defense when its own prior representations or con-

---

**3.** In their second amended complaint the Allens do not use the term "equitable estoppel" in stating their claims. They do, however, allege all of the elements of equitable estoppel. In determining whether in a diversity case a claim of estoppel is sufficiently pleaded, the Federal Rules of Civil Procedure control. *Nilsen v. City of Moss Point,* 621 F.2d 117 (5th Cir.1980); 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1272. Under Fed.R.Civ.P. 8(c) it is not necessary to use the term "equitable estoppel" in the pleadings in order to satisfy the requirement that the affirmative defense of estoppel be pleaded. Rather, it is generally accepted that it is sufficient if a litigant pleads all of the elements of equitable estoppel in a defensive pleading. *See Nilsen v. City of Moss Point,* 621 F.2d 117 (5th Cir.1980); *cf. Barnwell & Hays, Inc. v. Sloan,* 564 F.2d 254, 255 (8th Cir.1977) ("The failure to use this specific terminology, however, does not necessarily mean that the answer did not raise the affirmative defense.").

duct have caused the plaintiff to run afoul of the statute and it is equitable to hold the defendant responsible for that result. *See Borzeka v. Heckler,* 739 F.2d 444, 448 n. 3 (9th Cir.1984); *Travelers Express Co. v. Cory,* 664 F.2d 763 (9th Cir.1981); *see also* 53 C.J.S. *Limitations of Actions* § 25 (1948 & Supp.1983).[4] The test frequently applied by courts is whether a refusal to allow the plaintiff to rely on estoppel would, under the facts and circumstances of the case, permit a defendant who has engaged in fraudulent deception to thereby gain an advantage.

Other courts have recognized that a manufacturer of medical products may be equitably estopped from interposing the statute of limitations when its misrepresentations or concealment of information have prevented consumers from discovering that a cause of action exists even though the plaintiff may have been aware of the fact of injury. In *Knaysi v. A.H. Robins Co.,* 679 F.2d 1366 (11th Cir.1982), a case involving injuries incurred in connection with the use of a Dalkon Shield, the Eleventh Circuit reversed an order granting summary judgment on the basis of a New York statute of limitations. In holding that the plaintiff's allegations were sufficient to raise factual questions concerning the statute of limitations issue, the court noted that:

> [t]he medical community and the consuming public, either directly or in justifiable reliance upon medical advice, rely on drug manufacturers for accurate information and assurances regarding the safety and efficacy of their products. The allegation is that Mrs. Knaysi and her gynecologist so relied in this case. Moreover, Robins is alleged to have published information about the Dalkon Shield which it knew to be false and to have suppressed damaging information about the device's danger. These facts were essential to make out the cause of action for products liability, breach of warranty, and other claims put forward by the Knaysis. Hence we conclude that the appellants' allegations, when measured against the standards for equitable estoppel under New York law, are sufficient to invoke the application of that doctrine.

*Id.* at 1369–70; *accord Perry v. A.H. Robins Co.,* 560 F.Supp. 834 (N.D.N.Y.1983) (defendant Dalkon Shield manufacturer may be equitably estopped from raising the statute of limitations as a defense under New York law if plaintiff can prove that company made fraudulent representations and that she justifiably relied upon them); *cf. Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, 1057 ("[T]he manufacturer of an ethical drug has a duty to warn the medical profession of dangerous side effects of its products of which it knows, has reason to know, or should know, based upon its position as an expert in the field, upon its research, upon cases reported to it, and upon scientific development, research, and publications in the field. This duty is continuing."), *cert. denied,* —— U.S. ——, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984).[5]

---

**4.** Statutes of limitations are primarily statutes of repose. They are designed to protect *unaware* parties against claims that have gone stale. *See Twin Falls Clinic & Hospital Building v. Hamill,* 103 Idaho 19, 25, 644 P.2d 341, 347 (1982).

**5.** In *Philpott v. A.H. Robins Co.,* 710 F.2d 1422 (9th Cir.1983), we held that under Oregon law appellee Robins was not equitably estopped from raising the statute of limitations as a defense to plaintiff's claims relating to injuries allegedly resulting from use of a Dalkon Shield. We refused to hold that equitable estoppel principles could extend the statute of limitations more than eight years from the time that the plaintiff underwent a hysterectomy. In *Philpott*

we determined that Oregon law admits only two situations in which equitable estoppel may prevent reliance on a statute of limitations. "A defendant may be estopped if he lulled the plaintiff, by affirmative inducement, into delaying the filing of a cause of action or, similarly, if he lulled the plaintiff into believing he had no cause of action against the defendant .... The other situation where Oregon courts have applied estoppel is where there has been fraud on the part of a *fiduciary* in concealing material facts evincing a cause of action." *Id.* at 1425 (emphasis added).

*Philpott* is inapplicable for three reasons. First, the plaintiff in *Philpott* had a hysterectomy in April, 1973 but did not file suit until

Recently, in *Twin Falls Clinic & Hospital Bldg. Corp. v. Hamill*, 103 Idaho 19, 644 P.2d 341 (1982), the Supreme Court of Idaho considered whether a plaintiff may invoke the doctrine of equitable estoppel in a professional malpractice action in order to prevent the defendant from interposing the statute of limitations set forth in Idaho Code § 5–219. The action alleged that the defendant architect fraudulently concealed the cause of the injury. The defendant argued that by enacting Idaho Code § 5–219 the Idaho legislature precluded the use of the doctrine of equitable estoppel as a bar to a statute-of-limitations defense, at least in professional malpractice cases. The Idaho Supreme Court determined that the legislature did not intend, by enacting section 5–219, to limit in any way the right of plaintiffs to invoke the doctrine of equitable estoppel.

> We find no intent, either explicit or implicit, in the language of I.C. § 5–219 to eliminate the doctrine of equitable estoppel in professional malpractice actions. Estoppel is a long accepted portion of Anglo-American jurisprudence. *See* 3 W. Blackstone, Commentary on the Laws of England 307 (21st Ed. 1844); E. Coke, Institutes of the Laws of England § 667 (16th Ed. 1812). In one of this Court's early decisions, *Fremont County v. Warner*, 7 Idaho 367, 370, 63 P. 106, 107 (1900), it was stated that estoppel as a principle is "so well established ... that it needs no citation of authority to support it." Since estoppel is found in the common law, statutory changes therein are not presumed but must be shown by a clear intent to alter or oppose the common law or repeal it by necessary implication.

103 Idaho at 21–22, 644 P.2d at 343–44 (citations omitted).

In *Twin Falls*, the Idaho Supreme Court set forth the following as the elements of equitable estoppel:

> (1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth, (2) the party asserting estoppel did not know or could not discover the truth, (3) the false representation or concealment was made with the intent that it be relied upon, and (4) the person to whom the representation was made or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*Id.* at 344; *see Holmes v. Iwasa*, 104 Idaho 179, 183, 657 P.2d 476, 480 (1983) ("Estoppel may prevent a defendant from asserting the statutory bar when his representations or conduct dissuade a plaintiff from prosecuting his cause of action during the period of limitations."); *see also Tommerup v. Albertson's, Inc.*, 101 Idaho 1, 607 P.2d 1055 (1980); *Idaho Title Co. v. American States Insurance Co.*, 96 Idaho 465, 531 P.2d 227 (1975); *Bjornstad v. Perry*, 92 Idaho 402, 443 P.2d 999 (1968).

The evidence offered by appellants, when viewed in the light most favorable to them, would, if uncontroverted, establish the first element of estoppel under Idaho

---

February, 1981. She was thus aware of the full extent of her injuries eight years before she filed suit, whereas Sandy Allen was aware of the "fact of damage" only months before she sued. Thus, even if Oregon and Idaho law were identical, the results in these two cases might differ. Second, we said in *Philpott*, without any discussion of the facts, that no "affirmative misrepresentations" had been made. *Id.* Here, as we explain *infra* p. 1373, appellants have introduced evidence that, at the least, raises a genuine issue of fact with respect to whether Robins made affirmative misrepresentations. Third, we agreed with the district court that sits in Oregon that, under Oregon law, the defendant's silence was not enough to preclude its assertion of the statute-of-limitations defense in

the absence of a special relationship, and that under Oregon law no such relationship existed. *Id.* at 1425–26. We made this determination after noting that, at the time, our rule was to accord substantial deference to the district court's construction of the law of the state in which it sits. *Id.* at 1423. We no longer follow this rule. Regardless of the district court's construction, we must determine Idaho law independently. *See In re McLinn*, 744 F.2d 677, 680 (9th Cir.1984) (en banc). We find that the elements of equitable estoppel under Idaho law are significantly different than under Oregon law, *see Twin Falls Clinic & Hospital Bldg. v. Hamill*, 103 Idaho 19, 22, 644 P.2d 341, 344 (1982), discussed *infra*, and that no similar special relationship is required.

law. The Allens introduced several exhibits at trial which could support a finding that the A.H. Robins Company falsely represented or concealed "material fact[s] with actual or constructive knowledge of the truth." Most significantly, the Allens submitted evidence that as early as 1971 Robins was aware of medical studies documenting the Dalkon Shield's "wick effect." The Allens also submitted a letter written by Dr. Thad J. Earl on June 23, 1972, which summarized all of his experiences with the Dalkon Shield while serving as the Robins Company's consultant on the product. This letter strongly suggests that the company was aware of the dangers of the Dalkon Shield in 1972, but concealed this information from both the medical profession and the public. The letter further indicates that at that time Robins was aware of the possibility that septic abortion could result if a Dalkon Shield were left in place during pregnancy. The official statement of the Robins Company in 1974 when it recalled the Dalkon Shield from the market—that there was "no reason to believe that the Shield should be removed from women still wearing them"—and the official statement a year later that continued use of the product was "safe," must be carefully scrutinized in light of all of the evidence in the record. The least that can be said, from the plaintiff's standpoint, as to the evidence before us, is that a genuine issue of material fact exists with respect to the concealment of critical information by Robins; similarly, at the very least, a serious question exists with respect to whether Robins made affirmative material misrepresentations.

■ The question with respect to the second element of equitable estoppel under Idaho law, *i.e.*, whether the Allens knew or were in a position to know before September 4, 1980 that the Dalkon Shield was the cause of Mrs. Allen's injuries, is also not appropriate for summary judgment. During the conversation of May 25, 1977, Dr. Slickers informed Sandy Allen that she had an infection and told her that her IUD should be removed as part of the treatment of that infection. He also told her that the Dalkon Shield had been removed from the market but, according to her testimony, when she asked him why, he changed the subject. These facts fall far short of establishing that Sandy Allen knew or should have known that the Dalkon Shield *caused* her injury.[6] Various inferences could be drawn from them. If no further facts were adduced, a jury might well determine that the Allens had no reason to know that the Dalkon Shield was the cause of Sandy Allen's continuing health problems and, therefore, conclude that the second element of the test was met. In any event, at this point in the proceedings, a genuine issue of material fact exists with respect to that element as well.

■ In connection with the second element, we note that it is unclear whether as a general matter a plaintiff has a duty of inquiry in an equitable estoppel case that is similar in nature to the one imposed under the fraudulent concealment exception. Assuming that there is such a general duty of inquiry, however, it arises only when the circumstances are such that a reasonable person would inquire. Here, the facts in the record thus far support appellants' position that no duty existed in this case. In

---

**6.** As we have already noted, Circuit Courts have, in four separate opinions, precluded Robins' statute-of-limitations defense on the ground that the plaintiffs could not have known at an early date what had caused their injuries. *See supra* note 2. In two other cases Robins was allowed to assert the defense because the plaintiffs actually knew the cause of their problems. In both *Timberlake v. A.H. Robins Co.,* 727 F.2d 1363 (5th Cir.1984), and *Sidney-Vinstein v. A.H. Robins Co.,* 697 F.2d 880 (9th Cir.1983), the plaintiffs had been told by their doctors at the time of their hysterectomies—many years before they filed suit—that their gynecological problems had been caused by the Dalkon Shield. *See Timberlake,* 727 F.2d at 1365–66; *Sidney-Vinstein,* 697 F.2d at 881, 884. Accordingly, in both these cases, even if the plaintiffs had initially relied on affirmative misrepresentations made by Robins, they could not reasonably have been misled by Robins' concealment after the time they learned the cause of their injuries. *See Mann v. A.H. Robins Co.,* 741 F.2d 79 (5th Cir. 1984) (applying Texas law to bar Robins' statute-of-limitations defense and distinguishing *Timberlake,* also decided under Texas law).

*Nelson v. A.H. Robins Co.,* 515 F.Supp. 623 (N.D.Cal.1981), another case involving injuries allegedly caused by the Dalkon Shield, the court found that no duty to inquire existed where the plaintiff had information similar to the information Sandy Allen had, stating that "it surely cannot be said as a matter of law that plaintiff, as a lay person, was under a duty of inquiry to have ascertained the complicated causal relationship without a more definite statement on the part of her treating physician." *Id.* at 626. The court went on to describe the type of information that must be available before it can be said that a plaintiff knew or should have known of the cause of action in a case of the type now before us:

> The information which the plaintiff must possess with respect to the diagnosis relating her injuries to a particular product is "meant to be ... an 'informed diagnosis' roughly parallel to 'informed consent' in medical malpractice or battery actions." The physician's diagnosis regarding causation must be such that a party understood the information to such a degree that it can be asserted that the patient knew or should have known that the defendant's allegedly defective product caused her injuries.

*Id.* at 626 (footnotes omitted).[7]

In any event, even if a reasonable person would have inquired in this case and Sandy Allen were thus under a duty to inquire, the facts presented thus far, when viewed in the light most favorable to appellants, support the conclusion that she satisfied that duty. According to her deposition, she asked Dr. Slickers why the Dalkon Shield had been taken off the market and he changed the subject. Again, at the very

least, a genuine issue of fact exists concerning this point.

There are also genuine issues of material fact with respect to the third and fourth elements of equitable estoppel under Idaho law. We first note that the statement of the Idaho Supreme Court with regard to reliance on a "concealment" cannot be taken literally. Plaintiffs do not *rely* on a defendant's "concealment." Rather, they rely on the defendant's implicit representation that it has disclosed all the material facts or at least has not concealed them. Nevertheless, the intent of the *Twin Falls* court is clear. Under the third element plaintiffs must demonstrate that the defendant misrepresented or concealed a material fact intending that their actions would be affected by that act of misrepresentation or concealment. Thus, a defendant must know or have reason to know that the facts being misrepresented or concealed would, if disclosed fully and truthfully, cause plaintiffs to act differently. It does not matter whether a defendant's conduct is intended to cause others to act or to deter them from taking actions they would have taken if they had been aware of the material facts.

■ Here, it is a reasonable inference from the facts in the record that Robins knew that persons like the Allens, persons who had purchased the Dalkon Shield and suffered injuries as a result of using that device, would file suit if Robins disclosed the information it possessed regarding the various hazards associated with its use; it is also a reasonable inference that Robins intended by its actions to prevent prospec-

7. In *Sellers v. A.H. Robins Co.,* 715 F.2d 1559 (11th Cir.1983), *reh'g granted,* 732 F.2d 129 (11th Cir.1984), the Eleventh Circuit determined that, under Alabama law, a plaintiff who was unaware of the possible connection between the Shield and her gynecological problems was required to make specific inquiries in order to comply with Alabama's "due diligence" requirement. *Id.* at 1562. In response to the plaintiff's contention that the court should apply the regular principles of equitable estoppel to bar Robins' defense, as it did in *Knaysi,* discussed *supra*

pp. 1371–1372, the court noted that *Sellers* was governed by the "[t]otally different legal principles and statutes" of Alabama. *Id.* We think that the New York rule enunciated in *Knaysi* is preferable to the Alabama rule and that the Idaho Supreme Court would apply the former rule. It hardly seems reasonable to require an individual who has no knowledge that a tort may have been committed to attempt to discover whether her illness results from another's wrongdoing or who the tortfeasor might be.

tive plaintiffs from gaining the knowledge that would cause them to file lawsuits and thus to deter them from doing so. Accordingly, for purposes of summary judgment, the third element is met.

■■■ It follows from what we have said that the fourth element of equitable estoppel, *i.e.*, that the plaintiff relied on the defendant's wrongful conduct, is met as well. The only additional fact required once the third element is established is that the plaintiff would have acted differently had there been a disclosure. Again, when viewing the facts in the light most favorable to the Allens, it can be reasonably inferred from the record that as a result of Robins' misrepresentations or concealment of information the Allens failed to file a suit against Robins within the period ordinarily permitted under the Idaho statute of limitations.

Under Idaho law each of the four factual elements discussed above must be proved in order to estop a defendant from raising the bar of the statute of limitations. *Tommerup v. Albertson's, Inc.*, 101 Idaho 1, 607 P.2d 1055 (1980); *Idaho Title Co. v. American States Insurance Co.*, 96 Idaho 465, 531 P.2d 227 (1975). The depositions, interrogatories, and documents prepared by Robins, which the Allens submitted pursuant to Fed.R.Civ.P. 56, strongly suggest that the Allens may ultimately prevail in their claim that Robins is equitably estopped from raising the bar of the statute of limitations. Certainly those materials do not provide any basis for a summary judgment for Robins. In conclusion, each of the four elements requires a factual determination which cannot be finally resolved on the basis of the record before us. *See Knaysi v. A.H. Robins Co.*, 679 F.2d 1366, 1370 (11th Cir.1982); *Perry v. A.H. Robins Co.*, 560 F.Supp. 834, 835 (N.D.N.Y.1983).

Accordingly, we hold that summary judgment was erroneously granted. We reverse the order of the district court.

REVERSED AND REMANDED.